Cuma., per Butler, J.
The jury have found in this case, that the Atalanta sunk by running on a concealed and unknown snag, in the ordinary boat channel, when the river was fairly navigable for steamboats; and that the loss which followed was not in consequence of a want of prudence and diligence on the part of the master and owners: and the material question now made is, did the presiding judge lay down the law correctly, as a guide for the jury, in coming to their conclusion? The charge of the judge, when fully analysed, is this: that the duties of the master and owners did not cease with the catastrophe which arrested and detained the boat, whereby the cargo became damaged, but that they might be held liable for damages arising from want of diligence and proper exertions towards saving and delivering the goods on board. The standard of such diligence and exertions, was said to be such a line of conduct as a prudent man of intelligence would have observed in taking care of his own property, similarly situated. This is but a different mode of stating the principle cf law which may be deduced from adjudicated cases, as applicable to this case, and in stronger terms than I find it laid down in any of them. The decided cases recognise the general principle of law, and illustrate its practical operation. The general principle is, that the master and owners of boats on inland *116 navigable rivers, like those of vessels at sea, are common carriers, that they are bailees for hire, and bound by the obligations of the law, to deliver goods placed on board their vessel at the place of their destination, unless they are prevented from so doing by the act of God, or public enemies. The bill of lading is the contract between the owners of the vessel and the freighters ; it is a contract signed by the master, for the owners, and subjects them to all the liabilities incident to it. As soon as goods are taken on board, the owners become insurers to a certain extent, and the only causes which will excuse them for the non-delivery of the goods, must be events falling within the meaning of one of the expressions 1 the act of God,’ and ‘ public enemies,’ unless the contract be specifically qualified and limited. The perils usually excepted, and for losses arising from which they are not liable, are those which do not happen by the intervention of man, nor are to be prevented by human prudence ; and losses arising from them are such as happen in spite of human exertion: 3 Kent’s Com. 212, 213, 215. It has been decided in this state, that a boat lost, by running on an unknown and concealed snag in the regular boat channel, may fall within the excepted perils.
The most usual contest in cases of wreck is, whether the losses from it are to be attributable to the negligence of the master, or are to be regarded as resulting from inevitable accident. When the wreck is inevitable, and a total loss is the immediate consequence, there is little difficulty in applying the general principle of law. In such a case, the master would be absolved from all Huesponsibility. When, however, the injury in the first instance, happens from the act of God — as by the stranding of a vessel — • and, after some interval of time a loss, either partial or total, is the ultimate consequence, there is much greater difficulty in deciding on the rights and liabilities of the parties concerned. The conduct of the master or owners then becomes a subject of important consideration. If they be guilty of negligence, they will be held answerable for all the damages that proceed from it. Their duty is to use all the means within their power and control, to arrest and obviate the consequences of the disaster; and I know of no better criterion, than that they should be bound to use such care *117 and attention as a prudent man would ffiave done in a similar situation, with regard to. his own property. Their duty is, to deliver the goods as they were left by the -wreck; if not in a sound, in their damaged state. What will excuse them, must necessarily depend upon the circumstances peculiar to each case ; and, in a great measure, must be a matter of fact to be submitted to the jury. When all reasonable efforts fail to save -the cargo, the ultimate loss may be fairly regarded as resulting from the first cause; as the vis major — upon the ground, that when human exertions have failed to obviate its consequences, the act of God may still be regarded as continuing its operation. In the case before us, it is certain that the Atalanta continued to be detained, by the snag on which she struck, for several months, in spite of all the exertions that were used to move her; and, that when she was loosed, she drifted down the river by a freshet, and was covered by the sand. After this, she was abandoned to any one, who might go to the expense or run the risk of saving any goods that were buried in her hold. Whether the best and most effectual means were used by the master and owners to save the goods, is a question full of difficulty and embarrassment. From the cases which I shall quote, I think their conduct should rather be judged of by the actual state of things at the time of the disaster, than by ultimate results. If success had actually crowned their efforts, it would have carried with it its usual fascination and authority, and would have been a sufficient vindication of the present defendants. Failure leaves room for conjecture to say that a different course would have led to different results. If, however, the course had been pursued, which is now indicated by the plaintiffs, and they had sustained a loss by it, they might well have found fault, and have said that defendants should have raised the boat before goods were taken out. It is much easier to criticise the conduct of others than to act well ourselves,'in the midst of embarrassing difficulties, such as surrounded defendants when the accident happened. — The cases which I shall now cite, will illustrate these general remarks and propositions. They have generally occurred in contests involving the liability of underwriters, on common marine policies of insurance, and where the defendants have con *118 tended that they were not liable, because the shippers or their agents were. In general, a vessel is doubly insured, when it leaves its port of departure — namely, by a policy of underwriters against the perils of the sea, and by the responsibility of the carriers, to be answerable for all losses that do not arise from such perils. Without saying that it is universal, I think I am safe in saying that it is a general rule, that when the carriers are liable, the underwriters are not; and vice versa. In the case of Cheviot v. Brooks, 1 J. R., 364, the action was against the master, for not asserting and establishing the plaintiff’s right to some cochineal, which he might have done after it had been captured by a British vessel. When the defendant’s vessel was captured, by a force «ígPch he could not resist, it appeared that all his papers were seized and taken from him; so that he had to rely entirely on his memory for the contents of the papers, in establishing the right to the different things that had been shipped on board his vessel. He saved all from condemnation but the cochineal; he was discharged from liability for this, because the means of claiming and establishing a right to it had been taken away from him, by a cause which could not have been prevented by him; and the loss was attributed to this cause, rather than to his neglect arising from his failure of memory — it appearing that he had not been guilty of bad faith or misconduct. In the case of Schieffelin v. N. Y. Ins. Co., 9 J. R. 21, the action was against the defendants, on their policy to be answerable only for losses from the perils of the sea. There were several causes which may have contributed to prevent and defeat the voyage in this case. It was however said, that the loss might properly be referred to the seizure, as the absorbing and prevailing cause. The remarks of Judge Kent, who delivered the opinion of the court, will throw some light on this case. When a vessel is stranded, a master ought to procure other means to send on the cargo, if he has it in his power; and if he can, and will not, it would seem to be the better opinion that the insurer is discharged. What may be done, ought to be done, when the rights of third persons are essentially concerned in the act. The master is the agent of the insured until a valid abandonment, and they should bear the consequences of his neglect. The *119 judge quotes the case from 2 Camp. N. P. 623, in which it was held that the plaintiff could not recover on a policy, where it appeared that there was a ship which the master might have procured to forward the cargo, near the injured ship, and which he neglected to employ. These authorities show that the neglect of the master will exempt the underwriters; but it seems to have been conceded, that where there was no neglect in the employment of means within the reach of the master, that the insurers would have been held liable. The authorities on the subject are fully quoted and commented on, in the case of Bryant v. Commonwealth Ins. Co., 6 Pickering. 143. The opinion of Woodworth, J. is quoted with approbation, in the case of Treadwell v. Union Ins. Co. 6 Cowen. 270, who says — “ if there be a vessel in the same or contiguous port, the duty of the master to procure it to carry on the cargo, is clear; the rule is imperative, but if resort must be had to distant places, and, independently of procuring a vessel, there are other serious impediments in the way of putting the cargo on board, the rule is not obligatory.” The judge who quotes the above, goes on to say, “ after all, it becomes a question of reasonable care and diligence on the part of the master, and like all other questions of that nature, after the facts are found, the law arising from them will be pronounced by the court.” This fairly brings up the question which was fairly involved in the case under consideration: were the defendants or their agents guilty of negligence in their care and management of plaintiff’s goods 1 If so, they should have been held liable for the damages that were attributable to it after the catastrophe. The jury have found that they used due care and diligence, and all the witnesses (and there were many sworn) except two, said that they approved the defendant’s conduct. All seemed to have supposed that it was practicable to raise the boat, and to forward the goods in another boat, to Cheraw, To this object, they directed all their exertions ; they employed a skilful man, and put thirty or forty hands under him; were engaged for three months, and spent $5,000. It is now said that they should have pursued a different course, and should have taken the goods out by hooking them up. All the witnesses who were examined on this point, said it would have *120 been imprudent, and perhaps impracticable. At first, there were no boats, upon which the goods could be taken off; and to have taken them on shore by hand, would have placed them in a worse situation than to let them remain in the vessel; as they would be exposed to putrefaction and theft on shore, whilst in doing so, all opportunity of raising the- boat would have been lost, by which it was thought that all the goods in the hold might have been saved. The witnesses who gave this opinion were intelligent men, and well informed on the subject of boat navigation. It seems to me, that a court should pause long, before it would undertake to decide otherwise. The jury who heard the case, and the witnesses who were most acquainted with the circumstances, may have been mistaken or unduly biassed. If so, how is that to be corrected ? This court will not undertake to direct a jury, peremptorily, how they shall find their verdict. I do not say that it is not competent for the court to do so : I can say, however, that I am not prepared for such a decision.
When -the boat was loosed from the snag, or the impediment that arrested and detained it so long, in spite of all the exertions that were used, it was carried down the river by a sudden freshet, and placed in a position from which it would have cost more than it and the cargo were worth to remove them. By every principle of maritime law, the defendants, then, had a clear right to abandon their charge. The goods were then damaged, and worth little : there was not only, technically, a total loss, which is estimated to be the case where the original cargo is destroyed to the extent of fifty per cent., but in this case, there was what might be termed, in fact, an entire loss. The cargo was not worth saving; at least, it was not worth the trouble and risk of reasonable men. The fact that some hardy and adventurous men, a year after-wards, did dive down, at the imminent risk of their lives, and get up some things, should afford no just criterion for prudent men. If the defendants had forced slaves to have gone down in the hold, under such circumstances, and death had ensued, I should have regarded them, in some measure, as guilty of a criminal homicide. No: the law is wiser in its requirements ; and this answer may be made to the argument urged — why did not the plaintiffs them *121 selves go and save the goods 1 there was nothing to prevent them. Their own conduct is the most satisfactory commentary on such an undertaking. My ’mind was better satisfied, on the circuit, with the conduct of the defendants after the disaster, than before it. They then pursued the course which prudent men advised, and which none undertook to condemn; and as I have intimated, their conduct should be judged of at the time they made a choice of an embarrassing alternative, and not by actual and unfortunate results- As in one of the cases put in the books, where a ship is in imminent danger of sinking in the high seas, and there is another ship, apparently of sufficient ability, passing by, the master may remove the cargo into such ship, and although his own ship happen to outlive the storm, and the other perish with the cargo, he will not be answerable for the loss.
I was not satisfied with the conduct of defendants, before the accident: my impression on the circuit (and it has not been since removed) was, that they put their boat on the river when it was too low, and in consequence of it, the boat ran on an unknown snag. Human temerity should not undertake impossibilities, and attribute the consequences to an act of God. This question, however, has been decided by the verdict of the jury, upon the testimony and opinion of witnesses; and, upon the whole, I can see no ground for setting aside the verdict. — The motion is therefore refused.
Gantt, O’Neall, Evans, and Eakle, Justices, concurred.